SOUTHERN DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Zoltan Boka

      Plaintiff                                    COMPLAINT



      v.                                     **15CV 6629**

RECEIVED AUG 2 1 2015 PRO SE OFFICE

Drs. Valerie Shafer, Lorraine Obler, Douglas Whalen, Klara Marton and William Kelly,

individually and in their capacities as professors and employees of the City University of New

York and Sharon Lerner, Katherine Raymond and Matthew Schoengood individually and in their

capacities as employees of the City University of New York, Chase Robinson, in his capacity as

the President of the Graduate Center of the City University of New York, James B. Milliken in

his capacity as the Chancellor of the City University of New York, the City University of New

York (CUNY) and attorney Steven L. Banks, an Assistant Attorney General of the State of New

York and Eric T. Schneiderman in his capacity as the Attorney General of the State of New

York.

      Defendants

---

Introduction:

      Plaintiff, appearing Pro Se, suffered a traumatic brain injury in infancy which afflicts him
with various disabilities. CUNY Defendants, with full knowledge of Plaintiff's neurological
impairment, admitted him to the Speech Language and Hearing Sciences Doctoral Program at
the City University of New York's Graduate Center on two occasions- once as a non-
matriculating student, and once as a full time matriculating student.

      Plaintiff successfully completed three and a half years of doctoral studies (2008-winter
2012). However, the issue of accommodations were never properly addressed. The issue came to

a head in the winter of 2012.  Defendant Lerner outlined, via email, how she thought Plaintiff should proceed in obtaining a new medical evaluation. Plaintiff obtained a new evaluation in the summer of 2012. Defendant Lerner refused to enact any of the accommodations suggested in the report of the consulting neuropsychologist. In their sole meeting about the issue, the following exchange occurred:

> Defendant Lerner: "Have you done any research, published anything?"

> Plaintiff: "Yes, I have a couple of publications."

> Defendant Lerner: "Well you know, there is a lot of crap out there."

Plaintiff subsequently approached Defendant Marton. Defendant Marton was and is the chair of his department. Defendant Marton is a neuropsychologist who specializes in disabled children. Plaintiff asked Defendant Marton for accommodations. Defendant Marton reacted by contacting Defendant Lerner and co-authoring a letter dismissing Plaintiff from the doctoral program.

CUNY Defendants were at all times fully aware that they were engaging in acts that could result in legal action. As Plaintiff learned, via a FOIL request, the stated cause of his dismissal- that he failed an examination- was pre-textual. In fact, as internal emails showed, Defendants Marton, Shafer, Obler and Whalen were engaged in a scheme to defraud and fail Plaintiff by having Defendant Whalen falsify a grading form and claim to have reviewed all of Plaintiff's work when in fact he had not. This scheme was initially proposed by Defendant Obler. In her proposal, Defendant Obler referred to a previous wrongful discharge claim against Defendant CUNY and surmised that having Defendant Whalen evaluate Plaintiff's work would inoculate Defendant CUNY against another lawsuit. The fraudulent grading form was withheld from Plaintiff until Plaintiff complained to CUNY's Dean of Student Affairs. The release of this fraudulent grading form was reluctant and involuntary.

With the same intent espoused by Defendant Obler- a desire to evade the consequences of their illegal conduct- Defendant Marton asked faculty members for their input regarding this issue. Members of the faculty spoke in terms of not wishing to overextend themselves by working too hard with students. None of the faculty advocated for providing accommodations. One, Dr. Richard Schwartz, proposed a scheme whereby Plaintiff would not be passed on his

first exam, nor failed, and would simply be forgotten about. This scheme would have used Defendant CUNY's policy that Doctoral students who did not pass the first examination could not advance beyond forty-five academic credits. Dr. Schwartz's plan was to use this forty-five credit rule to quietly stop Plaintiff from advancing without taking a stand on either his request for accommodations or the quality of his work.  Plaintiff did not know of these emails until more than a year after his dismissal.

Plaintiff instituted an Article 78 action. In the course of that action, several Defendants, who are also Defendants here, submitted affidavits to the Court. Some of these affidavits were, in several key respects, materially false. These perjured affidavits helped Defendant CUNY gain a favorable judgement again through fraud. In submitting these affidavits, the CUNY Defendants were at all times assisted by and acting in concert with the office of the attorney general of the State of New York which defended these proceedings and helped them submit their perjured affidavits. The office of the attorney general, through Defendant Banks, also made at least one false statement in open court when he mis-stated the scope of accommodations Plaintiff sought.

Statement of Jurisdiction and Venue:

1. Federal courts have jurisdiction because this case concerns violations of the Rehabilitation Act of 1973, 29 U.S.C. § 794(a) and 42 U.S.C. § 1983.
2. Jurisdiction is also proper as per 28 USC §§ 1331, 1343(a)(3) and 1343(a)(4).
3. Venue is proper in the Southern District of New York because Defendant CUNY is based there (see 28 USC 1391(b)).
4. Declaratory and further relief is authorized as per 28 USC §§ 2201 and 2202.

The Parties:

5. Plaintiff was a doctoral student enrolled at one of the campuses of Defendant CUNY.
6. Defendants Shafer, Obler, Whalen and Marton were professors responsible for his doctoral education.
7. Defendants CUNY, Kelly, Lerner, Marton, Obler, Raymond, Schoengood, Shafer, and Whalen knew that Plaintiff is learning disabled due to a childhood brain injury.

8. Defendants Lerner, Marton, Obler, Schoengood, Shafer, and Whalen were employees of Defendant Robinson who is himself and employee of Defendant Milliken.

9. Plaintiff provided Defendant Lerner with medical records in 2008.

10. Plaintiff, at the urging of Defendant Lerner (Exhibit #1), obtained additional medical reports (Exhibit #2) which Defendant Lerner admits to receiving in June 2012 (Exhibit #3).

11. Upon receiving these documents, CUNY Defendants, at the suggestion of Defendant Obler (Exhibit #4) began to look for a way to expel Plaintiff instead of accommodating him.

12. In a state court legal proceeding post-expulsion, several CUNY Defendants, assisted by Defendant Banks, an employee of Defendant Schneiderman, entered into evidence affidavits which contained statements they knew to be false. Defendant Banks also made at least one false statement to the Court, during the proceedings.


Facts:

13. Plaintiff suffered a stroke on the second day of his life.

14. Subsequently, Plaintiff suffered a condition called hydrocephalus, which is colloquially known as "water on the brain".

15. A shunt was inserted to drain the excess fluid from Plaintiff's brain.

16. The shunt became infected and had to be removed.

17. Plaintiff took anti-seizure medications until the age of ten.

18. Subsequently, Plaintiff suffers from certain physical and learning disabilities.

19. These disabilities include tremors in the hands and feet, memory lapses, problems with spatial orientation and other neurological and physical symptoms.

20. In spite of the foregoing, Plaintiff has earned a Master's degree and was enrolled at Defendant CUNY's Graduate Center for a doctoral degree in speech, language and hearing sciences.

21. At all times during his matriculation, it was known to Defendant CUNY and personnel within same that Plaintiff needed accommodations due to his learning disability.

22. Nevertheless, after years of ignoring Plaintiff's needs, Defendant Lerner asked that Plaintiff obtain an additional medical report.

23. Plaintiff complied and Defendant Lerner received that report in the summer of 2012.

24. Defendant Lerner refused to implement the medical report and largely ignored Plaintiff's requests for same, with the exception of a single meeting between the two where Defendant Lerner repeatedly and gratuitously insulted Plaintiff.

25. Defendant Marton is a neuropsychologist. Defendant Marton has a long track record of advocating for disabled children. Defendant Marton is also the chair of the Speech Language and Hearing Committee.

26. In spite of her research work and record of advocacy, Defendant Marton reacted poorly when Plaintiff gave her his medical records: Instead of accommodating his disability, Defendants Lerner, Marton and Schoengood engaged in a collaborative exercise where they wrote up a letter expelling Plaintiff.

27. Plaintiff received this email within hours of the department secretary forwarding his medical documents to Defendant Marton. Accommodating him was never discussed.

28. The letter expelling Plaintiff stated, as its cause, that Plaintiff failed an examination twice.

29. Plaintiff subsequently discovered, via a FOIL request, that Defendants Marton, Obler, Whalen and Shafer were all aware of his medical situation and they hatched a plan to fail him in a way that- according to Defendant Obler- would pass legal muster.

30. In furtherance of this plot, Defendant Whalen executed a materially false grading form claiming to have read all the drafts of Plaintiff's work and Defendant Marton relied on this fraudulent document to expel Plaintiff.

31. The letter expelling Plaintiff was co-authored by Defendants Marton and Lerner.

32. Defendant Lerner is an attorney licensed to practice in the state of New York.

33. Defendant Lerner violated the New York State Rules of Professional Conduct by assisting Defendant Marton in an illegal act.

34. These acts of misconduct were compounded when, in the course of a subsequent state court proceeding, Defendant Lerner, with the assistance of Defendant Banks submitted a materially false affidavit to the court, claiming that Plaintiff did not discuss with her accommodations for his first examination before the summer of his expulsion, when in

fact the issue of accommodations and the first examination have been broached, both specifically and generally in the context of Plaintiff's matriculation as early as February 2012.

35. Defendants Marton and Banks also submitted a materially false affidavit to the court, this one claiming that Plaintiff received feedback on two prior occasions before failing, when in fact Plaintiff only received one set of comments.

36. The affidavit submitted by Defendants Marton and Banks also averred that Plaintiff did not need accommodations on the first examination since it is a paper not a timed test.

37. However, by the time Defendant Marton made this declaration she had a copy of Plaintiff's medical evaluation and leave of absence request, both of which explicitly stated that Plaintiff needs accommodations for the first examination.

38. Defendant Banks compounded the central falsehood of the affidavit discussed in paragraph 36 and specifically stated in court that Plaintiff did not seek accommodations on the first examination when in fact Plaintiff was actively seeking such accommodations.

First Cause of Action - Discrimination:

39. Federal law requires that when an individual presents with a request for disability education, the institution at hand engage that individual and discuss with him a mutually satisfactory way to accommodate that disability while simultaneously affirming the right to set institutional standards. The decision of whether to grant accommodations, and if so, which ones, "requires a fact-specific, individualized analysis of the disabled individual's circumstances and the accommodations that might allow him to meet the program's standards" (Mary Jo C. v. NY State and Local Ret. Systems, 707 F.3rd 144, 165 2nd Cir. Ct. of App. 2012).

40. Failure to engage a disabled individual in these discussions results in a valid claim under federal law that the institution which refused to engage the disabled individual discriminated against same (Brady v. Wal Mart Stores Inc., 531 F.3d 127 2nd Cir. Ct. of App. 2008).

41. Defendant Lerner admits (Exhibit #3) that she received additional medical records in June 2012. This triggered her legal obligation to find a mutually satisfactory solution by which Plaintiff could be accommodated.

42. Instead of following the law, Defendant Lerner, an attorney, evaded Plaintiff until July 5, 2012 when they finally met.

43. During the July 5, 2012 meeting and thereafter, Defendant Lerner made no effort to engage Plaintiff or to provision accommodations for him.

44. At the July 5, 2012 meeting, instead of discussing the issues with Plaintiff, Defendant Lerner repeatedly belittled him, implied that his publications were "crap" and demanded to know why he would even bother with a doctoral degree.

45. Subsequently, Plaintiff's physician separately contacted Defendant Lerner and obtained an assurance that Defendant Lerner would in fact do her best to provide accommodations (Exhibit #5).

46. Defendant Lerner lied to Plaintiff's treating physician.

47. Defendant Lerner, in spite of a promise to the contrary, continued to refuse to act or to engage Plaintiff in any way after the July 5, 2012 meeting.

48. Plaintiff repeatedly wrote to Defendants Lerner, Schoengood, Kelly, Marton and CUNY (Exhibits 6, 7, 8 and 9) repeatedly requesting educational accommodations.

49. In these documents, Plaintiff specifically asked for help to complete the required work that would lead to a Ph.D.

50. None of the Defendants ever discussed Plaintiff's needs with him in any way after the July 5, 2012 meeting.

51. The foregoing is sufficient to comprise a discrimination claim under Brady. To wit, Plaintiff, an otherwise qualified disabled individual who was admitted to The Graduate Center twice- as a non-matriculating and then as a matriculating student- suffered an adverse action, namely his expulsion, because of his disability.

52. For the foregoing reasons, Plaintiff asserts that Defendants violated § 504 of the Rehabilitation Act of 1973 by their actions and discriminated against him.

Second Cause of Action - Retaliation:

53. While Plaintiff was engaged in attempting to secure accommodations, he was also working on a doctoral examination.

54. Unbeknownst to him at the time, Defendants Shafer, Whalen, Marton and Obler, keenly aware of the possibility of legal action (Exhibit #4), engaged in a scheme to thwart Plaintiff by grading him in a way that would ensure that he could no longer matriculate at the Graduate Center. In fact, Defendant Obler was explicit in her desire to retain the services of Defendant Whalen in order to avoid a wrongful termination lawsuit.

55. In a scheme proposed by Defendant Obler (Exhibit #4) and ratified by Defendants Marton and Shafer, Defendant Whalen was approached and asked to grade Plaintiff's examination. In making this request, Defendant Shafer averred (Exhibits #10 and 11) that Plaintiff was always a poor student, that he was admitted "when our numbers were low" (language in Exhibit #11)- implying that he was admitted as part of a scheme to boost enrollment- and that Plaintiff changed his paper's topic without the foreknowledge of Defendant Shafer.

56. This latter claim- that Plaintiff changed his paper's topic without Defendant Shafer's foreknowledge- was materially false as Defendant Shafer was advised of the change of topics both verbally and in writing (Exhibit #12).

57. Defendant Whalen submitted a materially false grading form (Exhibit #14) that claimed that he had reviewed both drafts of Plaintiff's work and found them wanting, when in fact, as can be seen from the prior grading form (Exhibit #13), Defendant Whalen did not participate in the first round of grading.

58. Defendants engaged in a scheme to dismiss Plaintiff from the CUNY speech language and hearing doctoral program by using materially false information.

59. Defendant Shafer either knew or suspected that this was an illicit scheme and thus asked Defendant Marton (Exhibit #15) whether Defendant Shafer should inform Plaintiff of Defendant Whalen's placement on his committee.

60. Defendant Marton did not respond to Defendant Shafer's question.

61. Defendant Shafer did not tell Plaintiff about the participation of Defendant Whalen.

62. In fact, Plaintiff did not receive a copy of his grading forms until late December 2012, five months after his dismissal.

63. This was the first time Plaintiff learned about the committee change and about Defendant Whalen's dishonest claim to have read both drafts of Plaintiff's work.

64. Plaintiff contacted Defendant Marton on August 23, 2012, and sought accommodations from her directly (Exhibit #16).

65. Upon receipt of same, Defendants Marton, Lerner and Schoengood engaged in a series of emails, which are chronologically assembled in Exhibits #17, 18, 19, 20, 21, whereby they composed a letter dismissing Plaintiff from school, relying on the materially false grading form executed by Defendant Whalen.

66. As a result of the emails described in paragraph 65 above, Plaintiff was dismissed from the Graduate Center the same day his request for accommodations was received by Defendant Marton.

67. It is axiomatic that an institution may not dismiss or harm an individual who is exercising his right to seek disability accommodations. To dismiss or harm such a person is to engage in retaliation against the individual (Treglia v. Town of Manilus, 313 F.3rd 713 2nd Cir. Ct. of App. 2012).

68. The elements of retaliation are that 1) Plaintiff was engaged in an effort to secure accommodations, 2) Defendants individually and Defendant CUNY were aware of Plaintiff being engaged in these activities, 3) Defendants took adverse action against Plaintiff, namely dismissing him and 4) a causal connection exists between the dismissal and the protected activity (Treglia at 719). The causal connection can be temporal (Treglia at 721).

69. Here, Plaintiff's dismissal, which became official within a day of his request for educational accommodations, is clearly an act of retaliation under federal law.

70. Although this scheme was primarily orchestrated by Defendants Lerner, Marton, Whalen, Shafer and Obler, Defendant Raymond, an attorney with the office of General Counsel at the central CUNY office also assisted.

71. In her recounting (Exhibit #22), Defendant Lerner stated that she discussed Plaintiff's need for accommodations- and shared his medical and academic records without his foreknowledge and permission- with Defendant Raymond, who then presumably advised Defendant Lerner to break the law.

72. The conduct outlined in paragraphs 54 to 71 above runs counter to 29 U.S.C. § 794(a), a statute which governs retaliation claims.

73. Namely, Defendants chose to exclude Plaintiff from their doctoral program in a well thought out scheme which involved fraudulently assigning him a failing grade, because they did not wish to deal with his disability.

74. The desire to not deal with Plaintiff's disability was a running theme in the emails they exchanged.

75. Professor Richard Schwartz's research is centered on children with speech and language impairments. Professor Schwartz proposed simply letting Plaintiff twist in the wind without either grading him or provisioning him with accommodations and simply stating that Plaintiff has not completed his first examination. Dr. Schwartz was quite proud of this solution and referred to it as "the easiest way to get him (Plaintiff) out" (Exhibit #23).

76. While these events were occurring, Defendant Lerner was working on securing grants for the costs associated with accommodating the disabled.

77.  Defendant Lerner engaged in this activity in spite of her office's plain disinterest in accommodating the disabled.

78. Although Plaintiff's needs were ignored, there were evidently no qualms about using his needs for pecuniary gain.


Third Cause of Action- 42 U.S.C. § 1983 (Lerner and Banks):

79. Plaintiff instituted an Article 78 proceeding in New York Supreme Court in late 2013, seeking reinstatement.

80. On January 17, 2014, Defendant Lerner submitted an affidavit to the Court (Exhibit #24).

81. In Paragraph 16 of this affidavit, Defendant Lerner averred that at no time prior to our summer 2012 meeting did she and Plaintiff discuss accommodations for the first exam.

82. This is materially false. As can be seen from Exhibit #1, this issue- accommodation for the first examination- was broached as early as the winter of 2012.

83. In subverting the legal process by committing perjury and thereby stunting Plaintiff's rights to due process, Defendant Lerner violated his rights under 42 U.S.C. § 1983.

84. The office of the attorney general of the state of New York, represented by Assistant Attorney General Steven L. Banks, delivered this false affidavit and defended a case based partially upon this instrument in a court of law. Thus, Defendant Banks violated Plaintiff's rights.

Fourth Cause of Action- 42 U.S.C. § 1983 (Marton and Banks)

85. As noted in Paragraph 78 above, Plaintiff instituted an Article 78 proceeding in New York Supreme Court in late 2013, seeking reinstatement.

86. In January 2014, Defendant Marton submitted an affidavit to the Court (Exhibit #25).

87. In Paragraph 28 of that affidavit, Defendant Marton stated that Plaintiff did not need accommodations for the First Exam because it is a paper not a formal test.

88. This is materially false. As can be seen in Exhibit #2, Dr. Bronson's report, Plaintiff required accommodations for written assignments as well as formal examinations.

89. In subverting the legal process by committing perjury and thereby stunting Plaintiff's rights to due process, Defendant Marton violated his rights under 42 U.S.C. § 1983.

90. The office of the attorney general of the state of New York, represented by Assistant Attorney General Steven L. Banks, delivered this false affidavit and defended a case based partially upon this instrument in a court of law. Thus, Defendant Banks violated Plaintiff's rights.

91. Rule 3.3 of the Rules of Professional Conduct prohibits an attorney from making false statements before a tribunal or use materially false statements or falsified evidence in furtherance of his case, and calls on a lawyer to inform a tribunal if he is notified that the evidence he has submitted is false.

92. Defendant Banks stood by silently, affirming the false statements made by his clients through his refusal to rebut same.

93. In fact, Defendant Banks stated in open court that "there was no specific request for accommodation for the first examination", a statement that is obviously false (see Exhibit #26, page 12, lines 21-22)[1].

---

[1] These were not the only times Defendant Banks was untruthful with the Court hearing the case. Defendant Banks filed a motion to adjourn the case on November 6, 2013. In his motion,

94. It should be noted that the Marton and Lerner affidavits were internally inconsistent.

95. Defendant Marton pleaded in paragraph 28 of her affidavit that "at no time prior to his being informed that he had failed the First Examination for the second time did Mr. Boka request an accommodation on the basis of disability from me, or to my knowledge from Director of Student Affairs Lerner…."

96. However, as can be seen in Exhibit #8, Plaintiff wrote to Defendant Lerner on August 10, 2012- a week before learning of the outcome of his examination, and asked that Defendant Lerner "ensure that I am provided with substantial and effective accommodations in order to complete the Ph.D. program. Kindly send a letter to myself and Dr. Marton, outlining what accommodations I must be given. "

97. What is more, in Paragraph 3 of Defendant Lerner's affidavit, Defendant Lerner swore that "Once I have a request for accommodation, I will follow up with the student's academic department to determine the appropriateness of the accommodation and of the possible arrangements for implementing the accommodation."

98. To believe Defendant Marton's claim that she did not know that Plaintiff contacted Defendant Lerner, one must also believe that Defendant Lerner committed perjury when she claimed that upon receiving an accommodations request, she follows up with Plaintiff's department, which was and is chaired by Defendant Marton.

99. Either Defendant Lerner lied in her affidavit about following up, or Defendant Marton lied in her affidavit about not being in the loop via Defendant Lerner.


Fifth Cause of Action- Fraud

100.    New York Courts and Federal courts adjudicating New York fraud claims recognize the doctrine of third party reliance (Prestige Builder and Management v. Safeco Ins. Co. 896 F.Supp. 2nd 198, 204 E.D.N.Y. 2012).

---

Defendant Banks proposed to adjourn until December 20, 2013. An adjournment was granted until December 10, 2013. On December 9, 2013, Defendant Banks sought a second adjournment and in his supporting affidavit to same stated "there have been no prior adjournment requests filed." On January 9, 2014, one day before his new deadline, Defendant Banks filed a third adjournment request which he labeled his "second adjournment."

101.    The doctrine of third party reliance holds that Plaintiff can show that a third party relied on material falsehoods made by the Defendant to the ultimate detriment of Plaintiff.

102.    Thus, the elements of a claim of fraud under the doctrine of third party reliance are a) material misrepresentation of an existing fact, b) made with knowledge of its falsity, c) with an intent to induce reliance upon same, d) justifiable reliance by a third party and e) damages.

103.    As noted in paragraph 57, Defendant Whalen submitted a materially false grading form regarding Plaintiff. This form averred that the second draft of Plaintiff's paper was no better than the first even though Defendant Whalen never read the first draft.

104.    This materially false representation was used to buttress Defendant CUNY's case that Plaintiff's dismissal was legally proper and to induce reliance by Justice Rakower of the New York State Supreme Court to rule against Plaintiff.

105.    Justice Rakower of course had every reason to trust an official university grading form and to rely on it.

106.    In her reliance, Justice Rakower ruled against Plaintiff, damaging him to his detriment.


Sixth Cause of Action- Fraud

107.    New York Courts and Federal courts adjudicating New York fraud claims recognize the doctrine of third party reliance (Prestige Builder and Management v. Safeco Ins. Co. 896 F.Supp. 2nd 198, 204 E.D.N.Y. 2012).

108.    The doctrine of third party reliance holds that Plaintiff can show that a third party relied on material falsehoods made by the Defendant to the ultimate detriment of Plaintiff.

109.    Thus, the elements of a claim of fraud under the doctrine of third party reliance are a) material misrepresentation of an existing fact, b) made with knowledge of its falsity, c) with an intent to induce reliance upon same, d) justifiable reliance by a third party and e) damages.

110.     As noted in paragraph 80, Defendant Lerner committed perjury when falsely claiming in her affidavit that at no time prior to the summer of 2012 did Defendant Lerner and Plaintiff discuss accommodations for the first examination.

111.     This materially false representation was used to buttress Defendant CUNY's case that Plaintiff's dismissal was legally proper and to induce reliance by Justice Rakower of the New York State Supreme Court to rule against Plaintiff.

112.     Justice Rakower of course had every reason to trust a sworn affidavit and to rely on it.

113.     In her reliance, Justice Rakower ruled against Plaintiff, damaging him to his detriment.


Seventh Cause of Action- Fraud

114.     New York Courts and Federal courts adjudicating New York fraud claims recognize the doctrine of third party reliance (Prestige Builder and Management v. Safeco Ins. Co. 896 F.Supp. 2nd 198, 204 E.D.N.Y. 2012).

115.      The doctrine of third party reliance holds that Plaintiff can show that a third party relied on material falsehoods made by the Defendant to the ultimate detriment of Plaintiff.

116.     Thus, the elements of a claim of fraud under the doctrine of third party reliance are a) material misrepresentation of an existing fact, b) made with knowledge of its falsity, c) with an intent to induce reliance upon same, d) justifiable reliance by a third party and e) damages.

117.     As noted in paragraphs 86-88, Defendant Marton committed perjury when claiming that Plaintiff did not need accommodations for the first examination because it was a paper not a formal test.

118.     In fact, Defendant Marton knew, both from Dr. Bronson's report and from her own training in learning disabilities, that this statement was not true.

119.     This materially false representation was used to buttress Defendant CUNY's case that Plaintiff's dismissal was legally proper and to induce reliance by Justice Rakower of the New York State Supreme Court to rule against Plaintiff.

120.     Justice Rakower of course had every reason to trust a sworn affidavit and to rely on it.

121.     In her reliance, Justice Rakower ruled against Plaintiff, damaging him to his detriment.

Eighth Cause of Action- Fraud

122.     New York Courts and Federal courts adjudicating New York fraud claims recognize the doctrine of third party reliance (Prestige Builder and Management v. Safeco Ins. Co. 896 F.Supp. 2nd 198, 204 E.D.N.Y. 2012).

123.      The doctrine of third party reliance holds that Plaintiff can show that a third party relied on material falsehoods made by the Defendant to the ultimate detriment of Plaintiff.

124.     Thus, the elements of a claim of fraud under the doctrine of third party reliance are a) material misrepresentation of an existing fact, b) made with knowledge of its falsity, c) with an intent to induce reliance upon same, d) justifiable reliance by a third party and e) damages.

125.     As noted in paragraph 93, Defendant Banks falsely stated in open court that Plaintiff did not request accommodations for the first exam.

126.     This materially false representation was used to buttress Defendant CUNY's case that Plaintiff's dismissal was legally proper and to induce reliance by Justice Rakower of the New York State Supreme Court to rule against Plaintiff.

127.     Justice Rakower of course had every reason to trust an officer of the court such as Defendant Banks and to rely on his representations.

128.     In her reliance, Justice Rakower ruled against Plaintiff, damaging him to his detriment.

Ninth Cause of Action- Due Process Claim

129.     A claim for violation of due process has two elements: that Plaintiff had a property or liberty interest that he was deprived of and that he was deprived sans due process (Morales v. New York 22 F.Supp. 3d 256, 276 S.D.N.Y. 2014).

130.     It has long been recognized that students have a legitimate property or liberty interest in their educational endeavors (Stoller v. Coll. Of Med. 562 F.Supp. 403, 412 M.D.Pa. 1983; U.S. Const. Amendment XIV Par. 1).

131.     By expelling Plaintiff after six years of educating him at his own expense, Defendants deprived Plaintiff of a legitimate property or liberty interest.

132.     By expelling him under false pretenses, Defendants deprived Plaintiff of his property or liberty interest in education without due process.


Tenth Cause of Action- Due Process Claim

133.     A claim for violation of due process has two elements: that Plaintiff had a property or liberty interest that he was deprived of and that he was deprived sans due process (Morales v. New York 22 F.Supp. 3d 256, 276 S.D.N.Y. 2014).

134.     It has long been recognized that students have a legitimate property or liberty interest in their educational endeavors (Stoller v. Coll. Of Med. 562 F.Supp. 403, 412 M.D.Pa. 1983; U.S. Const. Amendment XIV Par. 1).

135.     Plaintiff's due process rights include being provisioned with disability accommodations so that he may complete his education (Alexander v. Choate 469 U.S. 287 U.S.S.Ct. 1985).

136.     By engaging in an underhanded scheme to fail Plaintiff on the basis of a materially false declaration by Defendant Whalen, Defendant CUNY deprived Plaintiff of his due process rights.


Eleventh Cause of Action- Due Process Claim

137.     A claim for violation of due process has two elements: that Plaintiff had a property or liberty interest that he was deprived of and that he was deprived sans due process (Morales v. New York 22 F.Supp. 3d 256, 276 S.D.N.Y. 2014).

138.     To claim a deprivation of due process one must show that he had an opportunity to present his claims or case free of malfeasance or misconduct.

139.     By presenting materially false information they swore to be truthful Defendants Lerner and Marton, ably assisted by Defendant Banks violated Plaintiff's due process rights.


Twelfth Cause of Action- Due Process Claim

140.     A claim for violation of due process has two elements: that Plaintiff had a property or liberty interest that he was deprived of and that he was deprived sans due process (Morales v. New York 22 F.Supp. 3d 256, 276 S.D.N.Y. 2014).

141.     To claim a deprivation of due process one must show that he had an opportunity to present his claims or case free of malfeasance or misconduct.

142.     By falsely stating that "there was no specific request for accommodation for the first examination", in open court, when in fact such request was duly made, Defendant Banks violated Plaintiff's due process rights.


Damages

143.     Plaintiff moves for his immediate reinstatement to the graduate center along with an education plan which addresses his disabilities and proposes a timeline to educate him in an expeditious manner, mindful of his potentially shorted lifespan.

144.     Plaintiff moves for an injunction requiring CUNY Defendants to submit to monitoring to ensure compliance with the education plan raised in paragraph 143.

145.     Shortly after expelling Plaintiff, CUNY Defendants sought to enrich themselves further by selling his outstanding tuition debt- tuition owed for the spring of 2012, which was consumed by CUNY Defendants refusal to provide accommodations- to a private company. Plaintiff moves that this debt be cancelled.

146.     Plaintiff moves for compensatory damages as per 29 U.S. 794(c) for the tuition paid to Defendant CUNY and demands that this sum be refunded in full along with any other fees charged by Defendant CUNY during the course of Plaintiff's matriculation as these funds were obtained in bad faith: As Defendant Shafer admits, Plaintiff was not admitted to be educated but rather to be used to pad Defendant CUNY's bottom line.

147.    Plaintiff also moves for compensatory damages for the tuition paid to Defendant CUNY and demands that this sum be refunded in full along with any other fees charged by Defendant CUNY during the course of Plaintiff's matriculation under New York's tort of fraud as explained by <u>Stein v. Doukas 98 A.D.3d 1024 N.Y. App. Div. 2nd Dep. 2012.</u>

148.    Plaintiff demands nominal and punitive damages for Defendants' violation of his due process rights as permitted under <u>42 U.S.C. § 1983</u> and permitted generally in cases where Plaintiff's constitutional rights are violated generally.

149.    Plaintiff moves for a full accounting of every grant, scholarship or other funding request made by any agent of Defendant CUNY where they used Plaintiff's enrollment as data supporting their request: This includes all funds sought as well as all funds obtained, including the specific amount, the funding organizations and the dates that these funds were sought and if applicable disbursed.

150.    Jury trial demanded.


Plaintiff, acting Pro Se, files this complaint on _2_ of August 2014.


Zoltan Boka                        Tel: (518)-221-6303

3564 89th st 4C                    Email: Zoltan.boka@gmail.com

Queens, NY 11372

**EXHIBIT #1**



Zoltan Boka <zoltan.boka@gmail.com>

## Update

Lerner, Sharon <SLerner@gc.cuny.edu>                                   Thu, Feb 2, 2012 at 11:27 AM
To: "zoltan.boka@gmail.com" <zoltan.boka@gmail.com>

Okay, this is a start.

I think and recommend that this is what you need to do (for this challenge and for your future needs): You need to provide your "old" evaluation report to whomever you may choose to see for further / new evaluation specifically in relation to doctoral program requirements. (By the way, I realized that I do not have the date of this report.). This should, I believe, be a neuropsychologist.

You should provide this person also with the GC Bulletin info about the program and its requirements and info from the program's website and any program handbook. I also recommend you provide copies of my several e-mails to you--including this one--on the issue.

The issue at hand is specifically to document the functional impairments more concretely and recomended accommodations specific to overcoming these impairments that would be appropriate for your exams. As I have explained before, I will evaluate recommended accommodations for their reasonableness and appropriateness in relation to the essential nature of the program / project / task. (Preliminarily, my research indicates that you would need to successfully complete the stats courses that are part of the program's required courses.)

Some recommendations may, of course, be purely for you to implement. In this area, I am still potentially concerned about your description of how you write papers. It seems to me that your process may evidence difficulty with thinking about and organizing a complex body of scholarly research material. Almost everyone struggles with aspects of this at some stage in research and writing, but, ultimately, this is something that a doctoral student must be able to do to successfully complete a Ph.D. program.
As I said when we talked about it, the very process of writing is part of thinking about and organizing material until a sort of "overarching" grasp of the big picture and the details is achieved--and communicated.

Anyway, much to think about, including practical details of what you should be doing in your program right now--i.e., your First Exam paper.

Please let me know your plans for further neuropsych consultation.

Sharon

**EXHIBIT #2**

**SARAH L. BRONSON, PH.D.**
**275 CENTRAL PARK WEST, SUITE 1A**
**NEW YORK, NEW YORK 10024**
**(212) 439-1057**
**(914) 961-1469**
**FAX (914) 771-5913**
sarahbronson@earthlink.net
sarahbronsonphd.com

**New York State Licensed Psychologist #8140**

**RE: ZOLTAN BOKA**
**DATE OF BIRTH: 11/18/77**

**Neuropsychological Assessment**

**Reason for Consultation:**

**Mr. Boka requested a neuropsychological consultation to help determine appropriate academic accommodations based on a neuropsychological opinion of his cognitive issues. Since both time and money were a factor, and because the background information (previous psychological assessment, medical information) and detailed clinical interview were sufficient to determine the exact nature of his disabilities, a full evaluation was not performed.**

**Review of Records:**

**Psychological Testing:**

**Prior psychological testing, done 2002, included a standardized IQ test, some achievement tests, and memory assessment. Findings were that on the WAIS III he had a statistically and clinically significant discrepancy between his Verbal and Nonverbal IQ, indicating a pattern of NonVerbal Learning Disorder. Specifically his Full Scale IQ was 107, 68th percentile, Average range; his Verbal IQ was 134, 99th percentile, Very Superior range; and his Performance IQ was 77, 6th percentile, Borderline level. His Verbal Comprehension Index was 134, 99th percentile, Very Superior. His Perceptual Organization Index was 74, 4th percentile, Borderline. His Working Memory Index was 141, >99th percentile, Very Superior. And his Processing Speed Index was 88, 21st percentile, Low Average. He was found to have very strong verbal abilities and very significant weaknesses in visual-spatial perceptual functioning and processing speed. On achievement testing (Woodcock-Johnson III), he was found to have relative strength in reading comprehension (Passage Comprehension, 86th percentile, High Average), understanding some math concepts (Math Fluency, 75th percentile, High Average) and writing ability (Writing Samples, 90th percentile, High Average) but relative weakness in processing efficiency in listening (Understanding Directions), reading (Letter-Word Identification, Reading**

Fluency), written expression (Spelling, Writing Fluency) and math calculations (Calculation, Applied Problems.) On the memory tests, he was found to have significant impairment on all aspects of immediate and short-term memory (verbal and visual) but did very well on auditory recognition memory tasks, as well as on working memory tests. His Auditory Immediate and Visual Immediate Index scores were: 18th percentile, Low Average and 10th percentile, Low Average respectively. His Auditory Delayed and Visual Delayed Index scores were: 23rd percentile, Low Average and 7th percentile, Borderline, respectively. However he scored at the 98th percentile, Very Superior level on the Auditory Recognition Delayed Index, meaning that while he had difficulty with immediate recall of material, he was able to recall it well when given prompts that "jogged" his memory, allowing him to retrieve stored material he could not recall on his own. He scored at the 92nd percentile, Superior level on the Working Memory Index, indicating that he can work with certain types of verbal concepts while holding them in short-term memory.

**Pertinent Medical Background:**

Mr. Boka was the product of a normal pregnancy and delivery but suffered a brain insult on his second day of life, with subsequent apparent sequelae. He suffered an intraventricular hemorrhage on the second day of life and developed secondary hydrocephalus which was treated successfully with a ventriculojugular shunt. He experienced one seizure at 3 years of age and was treated with anti-seizure medication (Mysoline) (discontinued at 14 years old.) His shunt was removed at age 5 years with a diagnosis of torticollis due to infection of the shunt. He has had life-long sequelae in terms of learning style issues as well as tremors in his hands and feet. The tremors tend to be worse on the left side, which is neuropsychologically consistent with the fact that his learning weaknesses involve right brain visual-spatial problems.  He also has ongoing difficulty with divided attention and retrieval problems, which are also findings that are consistent with a history of brain trauma.

**Relevant Developmental and Academic Background:**

Mr. Boka attended regular schools and has achieved at a high level to date. However, he has always had an ongoing pattern of very significant intellectual strengths as well as significant weaknesses. Because he is so bright verbally, he has managed to compensate to some degree for his severe weaknesses. However, his compensatory strategies can only help to a degree and academic accommodations are warranted. Mr. Boka has always displayed severe problems with visual-spatial perceptual functioning. In day to day life, he has always had difficulty orienting himself spatially in his physical environment. He is prone to getting lost whenever he is in unknown as well as known physical locations and needs to live in a city such as New York City which has a logical grid configuration. He literally cannot orient himself and needs assistance from others. He also has had significant weakness with math in school. Mathematical reasoning and calculation are based in visual-spatial reasoning and adequate spatial orientation. For example, on the GRE's his Verbal score was at the 96th percentile, Superior level but his Quantitative score was at the 49th percentile, Average level. This discrepancy is statistically significant and means that there is an underlying cognitive dysfunction and/or learning disability.

In addition, while he is very verbal and capable of strong analytical thinking as well as written expression of his ideas, when writing longer papers he has had lifelong difficulty with organization of his written papers, interfering with his overall performance. His difficulty with organization of written work is also due to his severe disability in visual-spatial perception. In addition, he has demonstrated lifelong difficulty with divided attention and retrieval of information, cognitive weaknesses that are also associated with his pattern of brain injury.

**Diagnostic Impressions:**

Mr. Boka meets neuropsychological and DSM IV criteria for learning disabilities. He meets ADA criteria for disabling conditions that impair all aspects of functioning: intellectual, social, academic, and vocational. It is also important to note that many aspects of Mr. Boka's intellectual functioning are in the Superior and Very Superior range and that his disabilities in no way constitute an impediment to successful achievement in his doctoral program and career of choice. He is very gifted in verbal functioning in terms of verbal expression, conceptual thinking, logical analysis, and all aspects of written expression (except organization), and is able to master and excel at the doctoral material in his current program.

Mr. Boka's organic cognitive weaknesses meet DSM IV criteria for the following disorders:

   1) Learning Disorder NOS (Visual-spatial perceptual problems, frontal lobe attention and retrieval problems) [315.9]
   2) Mathematics Disorder [315.1]

**Learning Disorder NOS:**

Mr. Boka has very severe impairment in visual-spatial perception. On psychological testing his Perceptual Organization Index on the WAIS III was at the 4th percentile, Borderline level indicating severe impairments in visual and visual-spatial perception. His scores indicate weakness in attention to visual details, sequential ordering, analysis of part-whole relationships, non-verbal reasoning, and spatial orientation. Impaired functioning in these areas means that the person will have difficulty with any aspect of academic and daily functioning involving these underlying abilities. Weakness in these particular areas means that the person will have difficulty with organizing written work and all aspects of mathematical functioning. Mr. Boka's difficulty with part-whole perceptual functions and sequential ordering means that he will have difficulty knowing how to organize his written work. He is able to generate many ideas, do conceptual analysis, write syntactically sophisticated sentences, but often will become overwhelmed when attempting to organize his written work. He will have no automatic intuitive sense of an inherent organization, or have trouble with optimal sequential organization of his ideas, or include parts in one section when they more appropriately would belong in another section. His frontal lobe weakness in attention also impacts his written expression. He has difficulty with divided attention, that is, focusing on more than one thing at a time. In the case of written expression, he has difficulty

focusing on what he is saying and the overall organization at the same time. On the psychological assessment, his Processing Speed Index was at the 21st percentile, Low Average level. This is a very low score given his Verbal Comprehension Index in the Gifted range, 134, 99th percentile, Very Superior level. His low score in processing speed means that he has difficulty working rapidly and efficiently and will need extended time at times to achieve at his true potential level. He should have extended time on tests (or take-home tests in Statistics. See below.) His visual-spatial and attentional problems also severely impact mathematical functioning. Mathematical reasoning is based in visual-spatial reasoning and mathematical computation involves visual-spatial organization of the written problem on the page. Attention and good sequential processing are also necessary for learning of math concepts and operations as well as executing math calculations. His problems with divided attention make him prone to making attentional errors, like leaving steps out (even when he knows them) and writing the wrong number when he intends to write another. Mr. Boka also has difficulty with efficient retrieval of stored information. Due to his frontal lobe dysfunction, he has inefficient access to his stored information, and is more likely to have difficulty when under time pressure and in his weaker area. That is, he will have most difficulty with retrieval when doing math in a timed math test.

## Mathematics Disorder:

Mr. Boka has a severe Mathematics Disorder, Visual-Spatial subtype. His visual-spatial weaknesses impact his ability to comprehend certain math concepts and to do quick, accurate calculations. His attentional problems lead him to make calculation errors due to sequencing and inattention. And his retrieval problems lead him to have difficulty with timely and efficient recall of stored math information. (See above section.) Because statistics can be understood by an intelligent person who can understand the logical concepts using his verbal analytical and conceptual abilities, he is able to comprehend statistics and use it appropriately in his doctoral program and career. But he needs certain academic accommodations in order to show his mastery of the material.

## Recommendations:

Based on his pattern of disabilities, the following academic accommodations are recommended.

1) ## Written Expression:
   It is recommended that Mr. Boka have organizational assistance from his professors when producing written work. At the undergraduate level, the appropriate academic accommodation for his type of disability is that he work with a writing coach, who would help him with organization and editing of his written papers. However, once a person is at the graduate level, it is usually not possible to find a writing coach with expertise in the area of graduate study. For this reason, it is recommended that Mr. Boka's professors provide the following assistance. At the graduate level, it is generally the case that each professor has his/her own particular preferences and requirements.

First, it is critical that for each class Mr. Boka should be provided with clear, written, detailed expectations and requirements for each assigned paper. This should include format and style details, in addition to the scope and nature of assignment, as well as page number expectation. He should also be given a sample paper so that he can very clearly see what the requirement is. Second, he should be given editing assistance from the professor. That is, he should be permitted to turn in a near-to-final draft to be reviewed and edited by the professor, and then he should have the opportunity to implement the recommendations. In other words, he should not be penalized for his organizational learning disability but instead have appropriate organizational assistance. For longer papers and theses, it is recommended that he be permitted to turn his work in by one section or chapter at a time. If he and the professor talk ahead of time about the recommended sections, and Mr. Boka is permitted to submit them one section at a time (for editing), this division into sections would provide an overall manageable organizational structure and would be an appropriate accommodation for his disability.

2) <u>Statistics</u>:

For Statistics, it is recommended that Mr. Boka be permitted to have a take-home examination in all courses. This recommendation is based on his difficulty with accurate calculation and efficient retrieval of stored knowledge under time pressure. Mr. Boka has a very severe Mathematics Disorder and the understanding of statistics does not come easily to him. He needs to use his excellent verbal skills to compensate, and effectively translate the quantitative concepts that come more easily and naturally to others into verbal, analytical concepts. This in and of itself requires extra time. His slower processing speed also impacts his timely completion of a test in a timed testing situation. He is not able to work as quickly as others can. He also has difficulty with the actual calculations themselves and needs extra time to do them as well as review his work for errors. Due to his attentional problems he has difficulty with quick computation. He also has difficulty with recall of statistics material. He may know something but not be able to retrieve it from his memory storage quickly enough in a timed testing situation. Furthermore, due to his cognitive impairments there can be a fatigue effect, leading to further inefficiency. If he is permitted to have a take-home test, this would alleviate the time pressure (allowing him to have the time he need for full recall of the material) and would enable him to correct for calculation errors. His take-home test should also be an open book test, since there is the possibility that he will not be able to fully recall some of the material. If he has a take-home test and is able to demonstrate that he fully understands the statistical concepts and can apply them to data in a proficient way, the objective of his learning the material will have been met. He would be able to function appropriately in the field.

3) <u>Other: Note taker</u>:

Because of his difficulty with processing speed and divided attention, Mr. Boka is not always able to focus on listening to the professor and taking

complete notes of the lecture material at the same time. He is eligible for a note-taker, which will enable him to have a full and accurate record of the class lectures.

_____

Sarah L. Bronson, Ph.D.
6/11/12

**EXHIBIT #3**



**Zoltan Boka <zoltan.boka@gmail.com>**

## Letter from Dr. Bronson

**Lerner, Sharon** <SLerner@gc.cuny.edu>                    Tue, Jun 19, 2012 at 10:16 AM

To: "zoltan.boka@gmail.com" <zoltan.boka@gmail.com>

Yes, I just received it yesterday. Have not yet had a chance to review. Maybe we can meet next week
to discuss.

**From**: Zoltan Boka [mailto:zoltan.boka@gmail.com]
**Sent**: Tuesday, June 19, 2012 10:10 AM
**To**: Lerner, Sharon
**Subject**: Letter from Dr. Bronson

Dear Sharon

I hope your summer is going well. Can you tell me whether your office has received Dr. Sarah Bronson's letter?

Thank you
Zoltan

**EXHIBIT #4**

**From:** Loraine Obler <loraine.obler@gmail.com>
**Subject: Re: Doug as third reader?**
**Date:** August 4, 2012 9:59:38 PM EDT
**To:** Klara <klaramarton@gmail.com>
Cc: Valerie  shafer val.shafer@gmail.com

If the idea is to have strong critiques such that we make it clear to Zoltan what the problems are, I think we'd be smart to have Doug do it. The last court-case the program was involved in was one where a student alleged the teacher had not passed him was not an expert in the area the question was in :).

What has Doug responded, Valerie?

best,
Loraine

Loraine K. Obler, Ph .D.
Distinguished Professor
Ph.D. Program in Speech-Language-Hearing Sciences
CUNY Graduate Center
365 Fifth Avenue
New York City, New York, 10016
tel.: 617 696 3619/212 817 8809

**EXHIBIT #5**



Zoltan Boka <zoltan.boka@gmail.com>

## spoke with Sharon

**Sarah Bronson** <sbronson2012@gmail.com>                          Mon, Aug 6, 2012 at 1:19 PM
To: Zoltan Boka <zoltan.boka@gmail.com>

Hello Zoltan,
I did speak in a detailed way with Sharon Lerner last week. I think it went well and that she does understand
your needs and will do her best to provide the accommodations we talked about. She was unsure about whether
you could take the alternate statistics course. I thought you had told me you couldn't...I am on vacation now until
Sept.
Please let me know how it goes.
Dr Sarah Bronson

**EXHIBIT #6**



Zoltan Boka <zoltan.boka@gmail.com>

## Following up on the issue of accomodations

**Zoltan Boka** <zoltan.boka@gmail.com>                    Tue, Aug 7, 2012 at 12:00 AM
To: "Lerner, Sharon" <slerner@gc.cuny.edu>
Bcc: **Redacted for privacy of third parties**

Dear Sharon,

It is my understanding that you discussed my situation with Dr.
Bronson and have a clear understanding of my needs and will do all you
can to ensure that I am provided with substantial and effective
accommodations as my condition requires and as Dr. Bronson had
outlined.

Thanks
Zoltan

**EXHIBIT #7**

**Mr. Zoltan Boka**

**34-33 83rd St.**

**Jackson Heights, NY 11372**

**Email: zoltan.boka@gmail.com**

**Phone: (518)-221-6303**

Sharon Lerner, Esq.

Office of Student Affairs, Room 7301

Graduate Center of the City University of New York

New York, NY 10016

10 August 2012

Dear Sharon,

It is my understanding that you discussed my situation with Dr. Bronson on or prior to August 6 2012 and will work to ensure that I am provided with substantial and effective accommodations in order to complete the Ph.D. program. Kindly send a letter to myself and Dr. Marton, outlining what accommodations I must be given. Please make certain that your letter mirrors the very specific accommodations stated by Dr. Bronson.

With regards to statistics, the three accommodations that would probably work best are:

1) a take home exam for ed psych 70600

2) 2) Dr. Verkulien's homework based class (which may or may not be scheduled for next spring) or

3) Dr. Chodorow's class, which uses take home exams.

Thanks for your earliest attention to this matter,

Zoltan Boka

**EXHIBIT #8**

**Mr. Zoltan Boka**

**34-33 83rd St.**

**Jackson Heights, NY 11372**

**Email: zoltan.boka@gmail.com**

**Phone: (518)-221-6303**

Dr. William Kelly
President
Graduate Center, City University of New York
365 5th Avenue

14 August 2012

Dear Dr. Kelly,

This letter is regarding Ms. Sharon Lerner, the Director of Student Affairs who is in charge of providing accommodations for disabled students. Ms. Lerner knows and has known for approximately four years now that I have a learning disability and am entitled to educational accommodations under federal, state and city law. At Ms. Lerner's insistence, I was given a neuropsychological assessment by Dr. Sarah Bronson on June 2, 2012. [Ms. Lerner was the individual who asked that I undergo said assessment. Dr. Bronson agreed independent of Ms. Lerner, to perform the evaluation.] Ms. Lerner received Dr. Bronson's report on June 18, 2012. It is now almost exactly two months later and the semester is scheduled to begin in about a week.

Although Ms. Lerner has spoken to both myself (on July 5, 2012) and Dr. Bronson (on or before August 6, 2012), she have yet to state, in writing, that the Graduate Center will provide me with the accommodations Dr. Bronson has outlined. This is in spite of the fact that, in addition to the foregoing, I emailed Ms. Lerner regarding this matter on August 7, 2012 and

followed up with a certified letter on August 10, 2012 (see enclosures) -both of which centered

on the (legally, medically and logically well-founded) expectation that she will provide the

accommodations Dr. Bronson had outlined in her report.

In light of this history, Ms. Lerner's silence is worrisome. Please assure me that Ms.

Lerner will act with alacrity and in good faith, to provide the accommodations which I am

legally entitled to (see e.g Alexander v. Choate, 469 U.S. 287, 301 (1985) which requires

reasonable accommodations for a handicap.)

Kindly have Ms. Lerner expeditiously send a letter to myself and Dr. Klara Marton, the

Executive Officer of my program, outlining what accommodations I must be given. Please make

certain that this letter mirrors the very specific accommodations stated by Dr. Bronson.

I appreciate your efforts on my behalf. Thanks for your earliest attention to this matter.

Very Truly Yours,

Zoltan Boka

Encl.

CC: Sharon Lerner, Esq.
Office of Student Affairs, Room 7301
Graduate Center of the City University of New York
365 5th Avenue
New York, NY 10016

CC: Dr. Sarah Bronson
242 Bronxville Rd., D4
 Bronxville, NY 10708

CC: Dr. Matthew Goldstein, President
City University of New York
Office of the Chancellor
535 East 80th St.
NY, NY 10075

CC: Susan Edelman
 Education Reporter
New York Post
1211 Avenue of the Americas
 NY, NY 10036-8790

CC: Vaughn Browne, Esq.
New York City Human Rights Commission
40 Rector St.
10th Floor
NY, NY 10006

**EXHIBIT #9**



Zoltan Boka <zoltan.boka@gmail.com>

## Arranging a meeting regarding my accommodations as per the Americans with Disabilities Act

**Zoltan Boka** <zoltan.boka@gmail.com>                              Mon, Aug 27, 2012 at 6:47 PM
To: "Lerner, Sharon" <slerner@gc.cuny.edu>
Cc: MSchoengood@gc.cuny.edu
Bcc: **REDACTED FOR PRIVACY**

Dear Matthew and Sharon,

I had a chance meeting with Sharon this morning and she invited me to meet with you both.

I am eager to discuss your concrete plans for implementing the reasonable accommodations contained in Dr. Sarah Bronson's June neuropsychological evaluation, an evaluation which Sharon asked me to obtain.

I understand that everyone has different needs and areas of expertise. Could you send me some background information related to your knowledge of my specific disability so I can prepare materials that might be useful in our dialogue?

Looking forward to meeting you,

Zoltan

**EXHIBIT #10**

From: Val [val.shafer@gmail.com]
Sent: Monday, August 06, 2012 10:26 AM
To: Whalen, Douglas
Cc: Marton, Klara
Subject: Fwd: Final draft

Hi Doug,
Can you read Zoltan's first exam? Both Klara and I agree that he has a very shallow
understanding of anything related to speech sciences. However, to be fair to him , it would be best
to have your assessment, since he took speech sciences with you , and you know what students
should have learned in your class. To give you some context, Zoltan changed from examining
infants exposed to English and Spanish to those exposed to English and Yoruba from his second
to third draft without consulting me. He failed the first exam, and one reason was that he had not
justified his language choice or his speech stimuli choices. So the attached exam is his revision.
I will also forward the feedback we gave to him regarding  the weaknesses.
Best,
Valerie


Sent from my iPad

**EXHIBIT #11**

From: Valerie Shafer [val.shafer@gmail.com]
Sent: Tuesday, August 14, 2012 12:06 PM
To: Whalen, Douglas
Cc: Marton, Klara
Subject: Re: Final draft

Hi Doug,
Thanks for the comprehensive review. There is a form that we fill out (I don't remember if we all
have to sign it, of just me - I will check tomorrow). You need to report a score between 1 and 5.
A score of 3 is the minimum for passing. A score of 1 or 2 is a fail. A score if 1 would indicate
that the exam was poor on every aspect (significance, design, writing). Your review below
suggests to me a score between 1.5 and 2. I have given it a 2 and agree entirely with your
assessment. Note that the shortcomings on this exam can be found in every paper that he has
written for my classes. He was admitted into our program when our numbers were low. I allowed
him to work in my lab because Marty asked me to take him on temporally. I encouraged him to
focus his first exam on an issue in second language learning (he teaches English as a second
language), but he did not take my advice. Rather he started writing an exam focusing on bilingual
Spanish-English infants' attention to speech (in part, because he was working for me and was
scoring looking time in infants from one of my studies). He wrote me two drafts that were flawed
in a similar fashion to what you received. I gave him suggestions regarding how to focus the
paper. He decided to shift the topic to examining the McGurk effect in bilingual infants for his
third draft. As you point out, there is "an interesting germ of an idea" in the paper. However, I do
not think that Zoltan has the ability to turn this idea into an experiment that will yield significant,
interpretable results, no matter how many times we were to let him rewrite. I think that we need
to make it very clear that it would be a mistake for him to continue in the Program because our
evaluation is that he will be unable to meet the requirements, and that the First Exam reveals this.
My guess is that he will challenge the decision.

Best,

Valerie

**EXHIBIT #12**

Final outline of final draft of QP1

Boka, Zoltan

This message was sent with High importance.

You forwarded this message on 6/14/2013 11:16 PM.

Sent:          Thursday, May 03, 2012 10:03 PM

To:            vshafer@cuny.gc.edu

Cc:            val.shafer@gmail.com

Attachments: Zoltan Boka QP1 Outline.docx**KB 25) (**[Open as Web Page]


Dear Dr. Shafer


It was nice seeing you at the MMN conference. As we discussed, I am sending along the final outline for the QP1 final draft. Please review it and let me know if it meets QP1 standards, especially with regards to depth and synthesis of literature review.


Thank you

Zoltan

Zoltan Boka

Final QP1 Outline

Dr. Shafer

3 May 2012

Background:

a.   The objective of this paper is to look at how the McGurk effect manifests itself in infants from Yoruba-English bilingual households.

b.   Explaining the McGurk effect and the variety of conditions (i.e. gender mismatch) during which it has been found

c.   Explaining the unity assumption model and how the McGurk effect follows this model.

d.   Review five selected brain imaging studies that have found a neurological basis for the McGurk effect.  (Four studies but one used both fMRI and PET)

e.   Draw out common areas of the brain these studies identified as being activated by the McGurk effect.

f.   Conclude that brains will react to auditory and speech stimuli.

g.   Review a number of non-English language studies [conducted where the L1 was not English], that looked at the McGurk effect. Note gap in study of Yoruba speakers.

h.   Review studies of ages during which McGurk effect has been found (i.e. seventy-four year olds). Note gap in studying eight to ten month olds.

i.   Review bilingual conditions under which the McGurk effect has been studied (i.e. Spanish L1/English L2). Note gap in studying bilingual Yoruba-English speakers.

j.   Note lack of studies of the McGurk effect in simultaneous bilinguals.

Significance:

a.   The McGurk effect increases over the timecourse of development as one becomes more exposed to a language.

b.   Infant studies do not look at infants from bilingual households.

c.   The proposed study looks at whether infants from Yoruba-English bilingual households exhibit the McGurk effect to a greater degree than infants from households where only English is spoken.

Infants and Speech Perception:

a.   Infants form statistical relationships between speech signals and use probability rules to determine the chances of what sound will come next.

b.   This is complicated but infants are quick to grasp it, leading to the suggestion that speech perception is innate in infants.